**Benjamin PISANO, Libelant,**

v.

**The S.S. BENNY SKOU, her engines, boiler, tackle, etc., in rem, and Ove Skou, D/S Ove Skou A/S & D/S af 1937 A/S, and Anchor Line, Ltd., Respondent-Petitioner,**

v.

**JOHN T. CLARK & SON, Respondent-Impleaded.**

United States District Court
S. D. New York.

Aug. 2, 1963.

Alvin L. Apfelberg, New York City, for libelant.

Haight, Gardner, Poor & Havens, New York City, for respondent-petitioner; David P. H. Watson, Robert K. Marzik, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for respondent-impleaded; Sidney A. Schwartz, Joseph Arthur Cohen, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondent-petitioner Anchor Line.

COOPER, District Judge.

This is an action for personal injuries sustained by libelant, a longshoreman, aboard respondent's vessel. Jurisdiction is based upon the general maritime law of the United States. The trial was held before the court, sitting without a jury.[1]

Libelant was injured on July 22, 1960 aboard the M/S Benny Skou, a vessel

---

1. At the outset of the trial libelant moved to discontinue as against Anchor Line, Ltd., and upon consent of all parties, the libel, and all other claims, made by and against Anchor Line, were dismissed and Anchor Line was eliminated from the case.

owned, operated and controlled by the respondent, Ove Skou, etc. (hereinafter Ove Skou). At that time, libelant was employed by the respondent-impleaded, John T. Clark & Son, and was lawfully aboard the vessel performing ship's services.

Upon arrival of the M/S Benny Skou, in New York City, she berthed south of Pier 51, North River, port side to pier, with her bow facing in toward the shore.

On the afternoon of July 21, 1960, libelant and his fellow employees spotted the booms for the #5 hatch. These booms, which were located forward of the hatch, were rigged with a married fall, i. e., the lines from each of the winches were shackled together and then linked to a common cargo hook. The starboard, or offshore boom, was positioned over the hatch and was being used as the up-and-down boom. The port, or inshore boom, was positioned over the pier and was being used as the burton boom.

The longshoremen, after positioning the booms, secured them by means of various guy lines and preventer wires. A schooner guy, running between the heads of the two booms, was secured and a guy line was run from the head of the burton boom forward to a padeye on the deck. This guy line was composed of manila rope approximately 2½" in circumference. The preventer wire, 6 x 19, was of the same circumference. The manner in which the preventer wire was rigged is one of the main disputes.

Approximately four months prior to the accident, the M/S Benny Skou was docked in New York City and similar cargo operations were performed. At that time, the preventer wire for the burton boom at the #5 hatch had been run from the head of the boom to the bottom horn of a vertical cleat, and then figure-eighted around the cleat to secure it—apparently the procedure followed theretofore. However, on that occasion, the bottom horn of the cleat snapped off and the preventer loosened. Whereupon the hatch boss, one Willie Cremona, instructed the longshoremen (among whom

was the libelant herein) to rerig the preventer by putting it through a swinging-link ring bolt on the deck, then running it through the eye of a turnbuckle on the mast stay (approximately 3–4′ aft), back through the swinging-link, then through the eye on the stay for a second time and back through the swinging-link for a third time. The longshoremen were told to put a half-hitch in the preventer wire and tie off the free end with a piece of manila yarn. The purpose of the half-hitch was to stop the preventer from running when stress was applied. The end of the wire was tied off to keep the half-hitch from becoming undone.

Between the time that the horn of the cleat snapped off and the time of libelant's accident, the M/S Benny Skou called at New York three or four times. The broken cleat was never repaired and the preventer wire continued to be rigged in the manner described above.

On July 21, 1960, the booms were positioned and the preventer wire rigged in a manner generally as just described and more particularly discussed below. The following morning, when the longshoremen returned to work the booms were in the same position. The loading of general cargo began with libelant acting as gangwayman.

At 9 A.M. on July 22, 1960, libelant went on his hour relief, Engel, one of libelant's co-workers, took over as gangwayman. During this time, the loading of general cargo was completed and two aluminum ingots (weighing a total of 1½–2 tons) were placed on a pallet for loading. The draft was hooked up and raised slightly to check the load.[2]

At this point, at approximately 10 A.M., Pisano returned to his duties, and Engel, after ascertaining that everything was satisfactory, ordered the draft lowered to the dock, and returned to his duties as winchman. Libelant then assumed the duties of gangwayman and supervised the loading of the ingots. As the draft began to come athwartships, Pisano stationed himself at the after end, port side

2 Maximum stress is not placed upon the lines and booms by this small lifting.

of the hatch, in order to direct operations. At that point, he was standing between the coaming of the hatch and the hatch board covers stacked on the inshore side.

Suddenly, a rumbling, tearing noise was heard, the burton boom swung laterally towards the hatch, and the draft fell against the hatchboards hurling them upon libelant. Pisano sustained comminuted fractures of the left tibia and fibula, was removed from the vessel by stretcher and taken to the hospital by ambulance.

After the accident, it was seen that the rope guy had parted approximately 30′ above the deck and the preventer wire was slack, indicating that it must have run, since there was no break in it.

The overwhelming weight of the credible testimony established that rigging the preventer wire by running it through the swinging-link three times, interspersed with two turns through the eye in the mast stay, followed by a half-hitch and a lashing off of the end of the wire (this method will hereinafter be referred to as the non-cleat method) was as satisfactory a method of rigging as figure-eighting the preventer around the cleat. The total evidence revealed that the non-cleat method was a safe and suitable method for securing the preventer wire. In point of fact, during the calls in New York between the time the cleat broke and the accident to libelant, the preventer wire was rigged in the non-cleat method without mishap.

■ Since a proper rigging of the preventer wire in the non-cleat method was satisfactory for the purposes intended, the fact that the cleat was broken has no bearing on this case. A broken cleat would render a vessel unseaworthy insofar as procedures involving the employment of the cleat are concerned. In the instant case, however, a perfectly suitable alternative method of rigging had been adopted. Thus, though the broken cleat might make the vessel unseaworthy, such unseaworthiness was clearly not the proximate cause of libelant's accident. Only if no other safe method of rigging the preventer was available could the condition of the cleat be considered a proximate cause of libelant's accident.

The proper rigging of the preventer in the non-cleat method required that a half-hitch be placed in it after all the turns had been taken. As already pointed out, the purpose of the half-hitch was to keep the preventer from running when stress was applied to it.

This particular half-hitch is a vital element in the case. Further discussion of it makes necessary a few remarks about the respective functions of the guy line and the preventer wire. The guy line was used initially to position the boom. It was then secured to aid in keeping the boom in position. In order to accomplish this, the tension on it and the preventer wire, were equalized. However, the preventer wire was the most important line to maintain the position of the boom and keep it from swinging laterally. As such, it was designed to bear most of the strain, and therefore must be taut. The half-hitch was put in it to stop the preventer from running when a strain is placed on it.

At the trial, Pisano was not questioned as to how the preventer wire was rigged the day before his accident or who rigged it. But during the two examinations before trial (Libelant's Exhibits 14 & 15) he stated in effect that he rigged the preventer and tied it off by lashing the end without tying a half-hitch in the wire.

The Second Mate of the M/S Benny Skou, Nielsen, stated that he looked at the preventer after the accident, and saw the end still lashed off (though part of the manila yarn had been cut). However, he found no half-hitch present in the wire.

This court finds that libelant, himself, rigged the preventer, and in the course of doing so unfortunately failed to put in a half-hitch. The absence of this knot made the preventer unsuitable for its intended purpose because when strain

was applied, the preventer began to run and a greater stress was placed upon the guy line. This increased strain, which the guy line was not meant to bear, caused it to break. When this happened, the boom swung laterally across the ship, and the draft of ingots struck the hatch boards, resulting in libelant's injuries.

From the total evidence, this is the most plausible explanation of the cause of the accident. The various theories advanced by libelant as to the causes of the accident are not sustained by the facts. The evidence to support them falls far short of sustaining the libelant's burden of proof, both quantitatively and qualitatively.

As to the rope guy line, there was no evidence that it broke before the preventer ran. The expert testimony was all to the effect that the guy line was not meant to withstand the total stress of the boom while a draft of cargo was being burtoned thwartships.[3] The testimony further revealed that the running of the preventer put an abnormal strain on the guy line causing it to break.

Nor is there any evidence that the guy line was defective. Even assuming, arguendo, that the guy broke first because of some internal defective condition, the preventer wire could have withstood the additional strain if it had been rigged properly in the non-cleat method. But, without a half-hitch in it, the wire would have run with the extra strain on it. The boom would then have moved laterally due to the absence of the half-hitch.

There has been testimony that the preventer wire was in a rusted, kinky and bent condition; that the longshoremen were unable to straighten the wire with their hands as they secured it; that because of this they were unable to secure the preventer properly and that there was some slack in it. The evidence on these points is insufficient and consequently unconvincing.

Libelant's theory apparently is that the guy line broke because of a defective

condition; that the release in tension allowed the burton boom to swing; that the boom was able to swing because of the slack in the preventer and that once having taken up the slack, the one-ton boom continued to move laterally and the presence of the half-hitch would not have been able to stop it.

■ The proof does not support this theory. Inference piled upon inference can not substitute for tangible evidence. In addition to the unsatisfactory testimony as to kinks and rust, Engel stated that he especially noticed this condition in the last 10 feet of the wire. Yet libelant himself testified that when he rigged the preventer there was about 10 feet of wire left after it was lashed. Thus, the very portion of the wire which was identified as being most kinky, would have no effect on the accident. Slack resulting from kinks, bends and rust would only play a part if it were in that portion of the preventer leading from the head of the burton boom to the swinging-link, or in that part of the preventer wound through the swinging-link and the eye on the turnbuckle stay. This court finds that the preventer wire was not in such a kinky, rusted or bent condition as to produce slack in the wire or to have any other causal relation to the accident.

We should mention two changes in the loading operation just before the accident.

First: The weight of cargo being loaded was almost doubled. On the afternoon of July 21 and the early morning of July 22, 1960 the longshoremen were loading general cargo which weighed approximately 1 ton. At the time of the accident, the first draft of aluminum ingots was being loaded. The weight of this draft was approximately 1½–2 tons. Though within the safe working load for the booms, it greatly increased the strain on the preventer wire.

Second: Between 9 A.M. and 10 A.M. on July 22 (prior to loading the ingots), the offshore up-and-down boom had been

---

3. The greatest strain on the rig, booms, lines and preventer occurs while the cargo was moved laterally, rather than when the draft was merely raised or lowered.

repositioned by lowering its head in order to reach the after end of the number 5 hatch. The expert testimony indicated that the effect of this was also to increase the strain on the preventer wire and guy line for the burton boom.

The combination of these two factors caused the preventer to start running. The undue strain placed on the guy line caused it to break, and the boom to swing laterally.

Libelant maintains that there is no testimony that the rigging done by him on July 21 was still in existence at the time of the accident. This is inaccurate. The overwhelming weight of testimony (principally from libelant's own witnesses) is that the booms were not repositioned or re-rigged when the longshoremen returned to work on July 22. Actually, during the work that morning, only the up-and-down boom was moved.

Libelant's claim that the demonstration model of the non-cleat method (Respondent's Exhibits D, D, and D2) was deceptive is without merit. This model was not introduced to show the tensile strength of the wire but merely to demonstrate to the court the proper manner by which the preventer should be rigged when the non-cleat method is used.

Respondent's contention that libelant was guilty of contributory negligence because of the place in which he was standing at the time of the accident is likewise without merit. Under the circumstances, libelant was in a safe place to properly perform his work. Nor is there evidence that the hatchboards were improperly stacked or placed on the deck.

In brief summation then, this court finds that it was safe and proper to rig the preventer wire by the non-cleat method. But the rigging in the instant case was inadequate since there was no half-hitch. The absence of this knot allowed the preventer to run for it was unable to withstand the stress it was meant to absorb. The M/S Benny Skou was unseaworthy at the time of libelant's accident, since the preventer wire was not in a condition reasonably suitable for its intended use. The unseaworthiness, resulting from the manner in which the preventer was rigged, was the sole proximate cause of the injuries to libelant.

However, libelant himself was the person who rigged the preventer and failed to put a half-hitch in it. Pisano's failure to do this made him guilty of contributory negligence. Since the vessel was unseaworthy only because of the absence of the half-hitch, a condition created by Pisano, this court finds him guilty of 100% contributory negligence.

Accordingly, judgment shall be entered for respondent, Ove Skou, against libelant. The third-party action and all claims arising therefrom are dismissed.

This opinion shall constitute the court's findings of fact and conclusions of law.

So ordered.